UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-                       Case No. 15-CR-111-WMC

ROBERT SHILTS,           Madison, Wisconsin
                           April 27, 2017
        Defendant.        3:30 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE THE HONORABLE WILLIAM M. CONLEY,

APPEARANCES:

For the Plaintiff:
             Office of the United States Attorney
             BY:  ELIZABETH ALTMAN
             Assistant United States Attorney
             660 West Washington Avenue
             Madison, Wisconsin  53703

For the Defendant:
             Federal Defender Services of Wisconsin
             Madison Branch Office
             BY:  JOSEPH BUGNI
             22 East Mifflin Street, Ste. 1000
             Madison, Wisconsin  53703

Also appearing:
             Robert Shilts - defendant
             Catherine Cwirla - US Probation Officer

Lynette Swenson   RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703

1       (Proceedings called to order.)

2            THE CLERK:  Case No. 15-CR-111.  *The United*

3  *States of America v. Robert Shilts* called for  sentencing.

4  May we have the appearances, please.

5            MS. ALTMAN:  Good afternoon, Your Honor.  The

6  United States appears by Elizabeth Altman.

7            MR. BUGNI:  Good afternoon, Your Honor.  Joe

8  Bugni from Federal Defender Services appearing on  behalf

9  of Mr. Shilts.

10 THE COURT:           Very good.  We are here for the

11 sentencing of Robert Shilts.  And my first obligation,

12 Mr. Shilts, is just to confirm that you've read  and

13 discussed the presentence report, the revised  report, and

14 the addendum with your counsel.  So have you had  time to

15 review those things with your  counsel?

16            THE DEFENDANT:  Yes.

17 THE COURT:           All right.  The government is moving

18 for a one-level additional reduction, I  assume?

19            MS. ALTMAN:  Yes, Your Honor.

20 THE COURT:           And I will note because  I received

21 such a detailed submission by the Federal  Defender's

22 Office in this case making a number of  policy arguments,

23 both general and specific, and also  factual arguments,

24 both general and specific to this defendant, that  if the

25 government wanted to submit a written response, I  would

1   give you time to do that before I  sentence.

2           MS. ALTMAN:  I don't think that's necessary,

3   Your Honor.  I'll just address them verbally.  But thank

4   you for the opportunity.

5           THE COURT:  All right.  I will then accept  the

6   plea agreement, finding that the offense of  conviction

7   adequately reflects the defendant's criminal  conduct.

8   The plea agreement does not undermine the  statutory

9   purposes of sentencing.

10  In determining the defendant's sentence, I will take 11

    into consideration the advisory sentencing  guidelines as

12  well as the statutory purposes of sentencing that  are set

13  forth in Sec. 3553(a).  It is those statutory  purposes

14  that control my  sentence.

15      I note that neither party objected to  the

16  presentence report, although the defendant  provided

17  additional information which was included in the revised

18  presentence report and now raises a valid  concern with

19  respect to enhancement for use of a computer in  Sec.

20  2G2.2, which I will  address.

21  Subject to that caveat, I find the probation office 22

    has calculated the advisory guidelines  correctly using

23  the current manual and taking into account  all relevant

24  conduct under Sec. 1B1.3.  The guideline for possession

25  of child pornography in violation of Sec.  2252(a)(4)(B)

1    is found in Title 18 -- I'm sorry, of Title 18 is   found

2    in Sec. 2G2.2.   The base offense level is 18   under

3    subsection 2(a)(1).   A two-level increase is   applied

4    under subsection 2(b)(2) because the defendant   possessed

5    images that depicted sexually explicit conduct   involving

6    prepubescent minors.   No more levels are added   under

7    subsection 2(b)(3)(F) because the defendant   knowingly

8    engaged in distribution of   those images.   An additional

9    four levels are added under subsection (b)(4)(B) because

10   the images involved the sexual abuse or   exploitation of

11   an infant and   toddler.

12        Finally, as I already alluded to, under   Sec.

13   2G2.2(b)(6), two levels are added because the offense

14   involved the use of a computer or   interactive computer

15   service for receipt of the   material.

16        As to this provision, I find the   two-level increase

17   has not been adequately considered by the   U.S. Sentencing

18   Commission.   If anything, as time wears on,   the specific

19   increase is becoming more and more or is becoming   less or

20   less relevant because most received possession   and

21   distribution of child pornography involves the use   of a

22   computer or interactive computer services at   this point.

23   Under Sec. 5K2.0, I will grant a two-level   downward

24   departure in light of that   fact.

25        This results in a total offense level   of 23.   Since

1  no other Chapter 2 adjustments apply, the  defendant

2  qualifies for a three-level downward adjustment  under

3  Sec. 3E1.1 because he has demonstrated acceptance  of

4  responsibility for his offense.   The government has  moved

5  for the additional  reduction.

6       With a total offense level of 20 and a  criminal

7  history category of I, the defendant has an  advisory

8  guideline imprisonment range of 46 to  57 months.   And

9  that's where I will begin to consider an  appropriate

10 sentence in this case.   And I will hear first  from the

11 government as to what that sentence should  be.

12          MS. ALTMAN:   Thank you, Your Honor.   And before

13 I begin with that, I would like to inform the  Court that

14 we have come to an agreement on the  restitution amount.

15          THE COURT:   I appreciate your  mentioning that.

16 And what is the amount that you  --

17          MS. ALTMAN:   It is $500.

18 THE COURT:          All right.   Which seems  appropriate

19 given the defendant's financial  status.

20          MS. ALTMAN:   And I would also note  that there

21 was only one  image.

22          THE COURT:   Understood.

23 MS. ALTMAN:          So then with regard to sentencing,

24 Your Honor, as I indicated I am basically --  my argument

25 is going to be responding to things in the brief that  the

1   defendant filed.   There absolutely is no doubt that  this

2   defendant has both physical and  mental challenges.    I

3   don't think anybody disputes that.   And the sentencing

4   brief cites the evaluator's note that it  ultimately

5   unable to provide a response, even after pausing for  over

6   four minutes.

7         The report also indicated that when he was  speaking

8   to his family, his responses occurred without  significant

9   pause and that they were clear  and logical.   He was also

10  able to get a  driver's license.   He was also able  to

11  engage and chat with the  undercover agent.   So we  know

12  that he is able  to learn.   We know he is able  to function

13  when he's doing things that he either has an  interest in

14  or are more familiar to  him.

15        THE COURT:   And it's hard to know which  it is.

16  The more familiar clearly is part of  this.

17        MS. ALTMAN:   Absolutely.   But he was also able

18  to learn enough to pass a driver's  test.

19        THE COURT:   Right, right.

20  MS. ALTMAN:             With regard to the  activity with

21  the family member that's discussed on page four,  there's

22  two separate incidents with the  family member.   The first

23  are the incidents that's described in the chats to  the

24  officer that would have occurred when the  defendant was

25  approximately 15 years old.   And the sentencing memo

1   indicates that it's because his intellectual was  far

2   beneath a normal 15-year-old, it's unlikely that  this

3   happened --

4           THE COURT:  What paragraph are you reading  this

5   from?

6           MS. ALTMAN:  It's page four, it's the  third

7   paragraph.

8           THE COURT:  All right.

9   MS. ALTMAN:          The problem with this  conclusion is

10  that the psychiatric report, which attached  the

11  psychosexual report, indicates that this  defendant was

12  already involved in inappropriate sexual contact  at age

13  11 or conduct at age 11; that he perhaps  --

14          THE COURT:  Yes, I know what you're referring

15  to.

16          MS. ALTMAN:  And yeah, with another  child and

17  also pretending to masturbate.  That's the first  part of

18  the contact with the  family member.  The second  part

19  isn't really addressed at all other than to  simply deny

20  it.  But if you look at the presentence report  in

21  paragraphs 37 and 38, the family member  was interviewed

22  in a forensic interview and gave  interesting statements:

23  The first one being she was afraid to say  anything

24  because she didn't think her family would  believe her,

25  and sure enough, that's exactly what happened.  She

1  reported some contact and they said oh, no.  He would

2  never do that.  That must have been a dream.  But the

3  details were so specific:  That her shorts were pulled

4  over to one side; the TV was off; and notably the  family

5  put a lock on the door the  next day.  So while they're

6  trying to convince her it didn't happen, it appears  that

7  they're less sure about that than their denials  would

8  indicate.

9      With regard to -- and this is the last argument  I

10  will make.  I'm not going to address the guidelines.  The

11  Court is aware of the guidelines as Mr. Bugni  states in

12  here.  These aren't new conclusions.  There is a decision

13  by the Second Circuit that says that you can't rely  on

14  the guidelines.  I know that argument has been  made

15  before.  The use of the computer is one that we  see all

16  the time.  In possession cases though, the  other

17  enhancements that this defendant is getting  aren't really

18  standard.  We have --

19      THE COURT:  And I have included all of  those.

20  MS. ALTMAN:          So that's my comment with  regard to

21  the guideline policy.

22      The final thing I would note, and this is  on page

23  eight and it's the very bottom of the  page, indicating

24  that due to his diminished capacity, "by  definition they

25  have diminished capacity to understand and  process

1    information, to communicate, to abstract from mistakes,

2    and to learn from experience, to engage in logical

3    reasoning and to control impulses." Controlling impulses

4    is where we have the problem here. The defendant did

5    say, it's included in paragraph 47, that if he had the

6    guts, he would probably touch the family member. And

7    then combine that with someone who has diminished

8    capacity to control his impulses and we have someone who

9    is a danger. I would, therefore, request the Court

10   sentence him accordingly.

11           THE COURT: Thank you, Counsel. Mr. Bugni.

12           MR. BUGNI: Thank you, Your Honor.

13           THE COURT: I have read with some care your

14   submission, which was very well crafted and persuasive in

15   a number of respects. I guess I don't share your

16   confidence to the possibility of the specific conduct

17   alleged, the hands-on conduct or reported as it being a

18   child fantasy, particularly given undisputed other

19   conduct when he was a child and the graphic descriptions,

20   which clearly exceeded what any actual contact that may

21   have taken place. But nevertheless shows tremendous

22   preoccupation. If either one of those weren't true, I

23   might share your view that I shouldn't give it any

24   weight. But I have both preoccupation -- severe

25   preoccupation, and a child who really had no reason to

1   raise it, who raised it initially outside of any   concern

2   with regard to the defendant among the family   members.

3   And the combination of the two makes it very   difficult

4   for me not to weigh that as part of the risk that   the

5   defendant presents.

6        MR. BUGNI:   I don't discount that.   Believe me,

7   I struggled with it and I was very careful with my   words

8   and what I thought --

9   THE COURT:          Again, I was -- I thought the

10  submission was wonderful and I hope Mr.  Shilts

11  appreciates how hard you've worked on his  behalf.

12  MR. BUGNI:          I would add that even if you   take as

13  true -- it's very difficult because you're in   a federal

14  court.   You're punishing for another crime.   Is there --

15       THE COURT:   It's not -- so we're clear,   I'm not

16  punishing for another crime, I'm trying to decide   what is

17  appropriate under all the circumstances and part   of what

18  I am to consider under the statutory purposes are   what

19  kind of a danger the defendant   presents.

20  MR. BUGNI: And I think that damager   can be 21
    remedied. I mean there's going to be an   eventual

22  release, and that remedy has to be with   supervision,

23  with, you know, you have to follow the rules, you can't

24  be around young kids, you can't live in that   house.

25            THE COURT:   Well, and in fairness, that's  also

1    not having a good solution at the moment, which  you

2    pointed out --

3          MR. BUGNI:  Yes.

4          THE COURT:  -- is also a concern to the  Court.

5    But the counterweight to that is, and you did  a

6    tremendous job of laying them out, is that  hopefully

7    there will be very limited opportunity and that  the

8    consensus by all of the experts seems to be that he is  a

9    low, at worst a moderate risk of any sort of reoffending

10   in that category.  So I am -- I am trying to weigh  all of

11   this, but I'm just, I guess, not as confident as  your

12   submission might suggest I should  be.

13         MR. BUGNI:  I think even though that  not

14   complete confidence in what I have offered, it's whether

15   it's sufficient but not greater  than necessary.  There

16   can never be those full assurances that we'd all  want

17   that this would never happen.  But part of it, we never

18   asked for bond in this case after  these allegations.  We

19   had a bond hearing and then I  withdrew it.  But we want

20   him away from the niece and we're trying to  put together

21   that plan.  That plan will have to be put  together some

22   time.  If this court were to sentence him to  prison, it's

23   going to have to be a little bit down  the road.  But if

24   the major concern is how do we protect society,  I think

25   we protect society  through supervision.  That's really

1  what supervision is there for.  That's why I asked for

2  such a lengthy term.  And that's why we really have

3  worked hard to put him in a group home and to put --  you

4  know, kind of get those strictures in place where  he's

5  not going to be around juveniles; where he's not going  to

6  be around minors.  And if it's true, if it's not true,  it

7  doesn't matter, we've ameliorated whatever risk  there

8  could be.  And I think that's what it comes down  to,

9  like, what are we trying to punish  here.

10  Because the traditional goals of punishment aren't  11

    always going to be as effective on Mr. Schultz  or Shilts.

12  Instead, it really becomes protecting the public and  I

13  think you can protect the public  with supervision.  Is it

14  perfect?  No, but there can never be perfection  in that.

15  But we offer a very good solution with the  halfway house

16  and giving him the opportunity to get into a  group home

17  and have that.

18      So Your Honor, I don't think there's anything  else I

19  can add to those points.  I hope that I've alleviated

20  whatever lingering concerns you have.  If there was a

21  perfect answer, I'd give it, but I don't believe  there

22  is.  But I just hope that what I've given is  good enough

23  to let Mr. Shilts go to the halfway house and  then from

24  there be able to reintegrate into  society.

25          THE COURT:  I'm not sure there is even a  halfway

1   house that I could send him to today, but I  understand

2   your general point that you think that's where he  should

3   be.

4        Mr. Shilts, I am interested in hearing from  you

5   today.  First, anything that you'd like to tell me  at

6   this time before I render  sentence.

7            THE DEFENDANT:  I am really sorry for what  I

8   did.

9   THE COURT:        You've been incarcerated now --

10  you've been at a jail for a  year-and-a-half?

11           THE DEFENDANT:  Yeah.

12  THE COURT:         Mostly in Sauk County;  is that

13  right?

14           THE DEFENDANT:  Yes.

15           THE COURT:  All right.  And generally you've

16  managed reasonably well it  sounds like.  I know it hasn't

17  been fun, but you've at least had some structure  and

18  you're taking care of yourself it  sounds like.  How would

19  you describe it?

20       (Pause)

21  THE DEFENDANT:          In what way?  How would you want

22  me to describe  it?

23           THE COURT:  What would you say  about it?

24       (Pause)

25           THE COURT:  Mr. Bugni, maybe you can  assist

1  because it's hard to know how much is processing and how

2  much is -- and I don't know if it's the -- if it's just

3  processing the permutations of what he could say or if

4  it's that he doesn't really have words.  I just don't --

5  so if you could help me somewhat, I would appreciate  it.

6          MR. BUGNI:  Sure.  Do you mind if I just  ask him

7  a couple questions kind of  --

8          THE COURT:  Sure.

9          MR. BUGNI:  Shiltsy, what do you like to do  in

10 the jail?

11         THE DEFENDANT:  I like to read books  and put

12 puzzles together.

13         MR. BUGNI:  And what about -- is  there anything

14 else?  What about anything that I send  you?

15         THE DEFENDANT:  I like to do word  search

16 puzzles.

17         MR. BUGNI:  And do you have any friends at  Sauk?

18         THE DEFENDANT:  Yes.

19         MR. BUGNI:  And what was the nickname they  gave

20 you?

21         THE DEFENDANT:  My nickname is Mud  Truck.

22         MR. BUGNI:  And how are the guards?  Do they

23 treat you okay?

24         THE DEFENDANT:  Guards treat me pretty  good.

25         MR. BUGNI:  And what's your favorite meal  there?

1    THE DEFENDANT:  I would have to say the  rice

2 dishes.

3    THE COURT:  Anything that you dislike?

4    (Pause)

5    MR. BUGNI:  Can I ask you  something?

6    THE COURT:  You're doing fine.

7    MR. BUGNI:  Would you like to -- do  you

8 sometimes where leg braces?  Are you supposed to wear  leg

9 braces?

10    THE DEFENDANT:  Supposed to.

11 MR. BUGNI:    Would you like to be able  to have

12 those back?

13    THE DEFENDANT:  Yes.

14 MR. BUGNI:    And what about do you like  it when

15 they -- the guys don't let you watch  NASCAR?

16    THE DEFENDANT:  Yes.

17 MR. BUGNI:    You like it when you  can watch

18 NASCAR, but what about when they won't put it  on?

19    THE DEFENDANT:  I don't like  that.

20    THE COURT:  How is your  back?

21    THE DEFENDANT:  It hurts every so  often.

22 THE COURT:    Yeah.  Are you getting your

23 medications?

24    THE DEFENDANT:  Yes.

25    THE COURT:  And does that  help?

1          THE DEFENDANT:  No.

2          THE COURT:  Just the pain is there.

3          THE DEFENDANT:  Yes.

4          THE COURT:  You apologized here today.  You said

5   you were sorry.  What do you apologize for?

6          THE DEFENDANT:  For everything that I did  and

7   said on the Kik  app.

8          THE COURT:  You understand that stopping  looking

9   at the images and talking to people about it is part of

10  what you have to learn  to do.  Do you  understand that?

11  THE DEFENDANT:          Yes.

12         THE COURT:  That might be the  hardest thing

13  about this sentence, but you will be back in  front of

14  another judge if you don't stop.  You understand?

15         THE DEFENDANT:  Yes.

16         THE COURT:  I didn't see it anywhere in  the

17  report.  I know he's been evaluated a couple  times now.

18  But any ongoing programming?  Not at Sauk.

19         MR. BUGNI:  No, Your Honor.

20  THE COURT:          All right.  I am prepared  to render

21  sentence.

22         AGENT:  Your Honor, I apologize for

23  interrupting.  But just for the record, I believe  that

24  the total offense level with acceptance and the two-level

25  departure is actually 23, not 20.  But the guideline

1 range is still 46 to 57.

2 THE COURT: Well, the total offense level -- so

3 the actual -- with removing the last two points would get

4 me to 26. So if I don't give an enhancement with respect

5 to use of computer, that would make the total offense

6 level of 26 and then with the three-level reduction it

7 would be 23.

8 AGENT: Yes, I believe so.

9 THE COURT: I appreciate your correcting that.

10 That doesn't change -- the guideline imprisonment range I

11 had right, I just had not -- I had twice reduced the

12 three-level adjustment. All right. So it remains 46 to

13 57 months.

14 The defendant grew up in a intact household and

15 reported having a happy childhood, although it was

16 plainly an isolated one, punctuated by limited

17 interactions with his father who struggled with

18 alcoholism and his mother who had responsibility for

19 supporting the household through in-home care, which

20 meant that she was away.

21 As the defendant reports, his school years were also

22 marked by bullying, and what can be as bad, indifference

23 by his classmates. As a result, the defendant spent most

24 of his time whether by choice or not alone. While he

25 enjoyed outdoor activities with his family, he was placed

1  in special education activities at a early age,  which

2  also contributed to his isolation, and  continued

3  throughout high school, although he had apparently  a

4  wonderful person assisting him in programming in  high

5  school.

6      Despite his learning disabilities,  teachers

7  expressed optimism that the defendant would lead  a

8  successful life, although he was described by those  who

9  knew him as isolated and  quiet.

10 As a child, the defendant admitted to being involved 11

   in several incidents of inappropriate  and nonconsensual

12 sexual contact.  The records confirm incidents  of

13 sexually inappropriate behavior in school.  The defendant

14 was able to gain a small group of friends in  high school,

15 although he continued to spend most of his time  away from

16 others.  He admitted to viewing pornography  for several

17 hours after school each day as a teenager, and  despite

18 this, did graduate from high school, in part due  to the

19 assistance that he received but also due to his  own

20 ability.

21     He continued living with his parents after  high

22 school.  His brother, his brother's girlfriend,  and his

23 niece also resided in the  home.

24     The defendant obtained his first job working  at a

25 car detailing shop.  Unfortunately he lost that job  due

1   to chronic physical health issues that inhibited  his
2   ability to work.   His physical condition worsened  with
3   age, requiring medical treatment.   And his mental  health
4   has also deteriorated, apparently as a result of  his
5   growing physical disabilities.
6       The defendant was placed on medication and has  been
7   financially supported through disability.
8       As for the instant offense, undercover officers  were
9   investigating the distribution of child pornography on a
10  messaging and chat room application  called Kik.   In
11  addition to receiving, the defendant also  distributed at
12  least eight images of child pornography on  Kik.
13  Additionally, he communicated with undercover  law
14  enforcement officers in chat rooms where he explicitly
15  disclosed sexually assaulting a 10-year-old girl.   Some
16  of that was clearly not true; however, the  defendant
17  described at least some conduct that could have  been
18  true.   The defendant later stated to law  enforcement that
19  the conduct he described was something he made  up merely
20  to engage in chat and it's clear that at least some  of
21  the conduct was exactly that.
22      On August 20, 2015, law enforcement executed  a
23  search warrant at the defendant's residence and seized
24  several items of technology that the defendant used to
25  access pornography, child pornography.   The  defendant

admitted to both posting and viewing child pornography  in

chat rooms, but denied any history of sexual contact  with

juveniles once he himself became a juvenile.  During the

investigation, a 10-year-old girl also reported to  law

enforcement that the defendant touched her vagina  while

she was sleeping.  Her parents insist the assault was  a

dream.  This is an oddly specific dream and at  least

suggested an inappropriate relationship existed  between

the two, something that would also seem confirmed by the

parents placing a lock on her bedroom door the following

day.

   The defendant agreed to a polygraph  examination in

which he was found to be deceptive in his  responses to

having sexual contact with minors, although it  is

difficult to assess whether the  defendant's processing

impairments may have contributed to that  result.

   Today the defendant is a  30-year-old man.  He has

been incarcerated for this offense since August  20th of

2015.  It's a very long time to be in  a jail.  Following

the defendant's arrest, he underwent  psychological

evaluations at the request of defense counsel and  by the

Court.  Some of the information contained  is conflicting;

nonetheless, it was determined that while  the defendant

suffers from depression and limited  cognitive

functioning, he was competent to stand trial as well  as

1  capable of understanding the legal proceedings  and

2  assisting in his  defense.

3      The defendant's health problems and mental  health

4  challenges appear to be effectively managed in  a

5  custodial setting.  The records reflect that he has  been

6  able to function appropriately in the general  inmate

7  population, which is not to minimize the challenges  that

8  he will have incarcerated in a prison  setting.

9      Even if this Court were to ignore the  alleged

10  hands-on report of sexual contact with the minor, his

11  conduct in this offense would still  be disturbing.   The

12  defendant knew what he was doing and used  specific search

13  terms to seek child  pornography images.   He posted images

14  as well as used nonpornographic images of a  known female

15  child as bait.   He knowingly joined a chat group  that

16  shared child pornography images and he  engaged in

17  egregious chats about sexually exploiting  minors.

18      Finally, the defendant openly chatted about and

19  discussed images that depicted the abuse of children

20  ranging from infants to the age of  ten.

21      The defendant is requesting a sentence  that will

22  allow him to immediately return to the community  in a

23  group home setting for the aged  and disabled.   Even if

24  appropriate, such a placement creates its  own logistical

25  difficulties given his sex offender status.   A specific

1  suitable group home has not yet been identified.  It is

2  undetermined if a group home will house him as a  sex

3  offender with all the vulnerable population of aging  or

4  the disabled involved.  There no doubt is a setting  that

5  we could find, but there are third-party risks that  will

6  be attendant and computer monitoring will be  difficult,

7  as anyone who had a computer would be a potential  source

8  for the defendant to access or to manipulate others  to

9  access images.

10 While his family remains supportive, they have in  11

   the past enabled and attempted to downplay  his conduct

12 and that too is a concern.  Supervision will certainly

13 provide the community protection, but the  proper setting

14 and the proper treatment is part of the  challenge that

15 the defendant will face.

16     While the defendant's mental and  physical conditions

17 are extraordinary and place him, in the Court's  view,

18 outside the heart line of a typical child  pornography

19 case, under Sections 5H1.3, 1.4 and 5K2.0, it could also

20 be argued that his cognitive limitations increase  the

21 risk he presents to the community.  I do think on

22 balance, and the experts seem to agree, that he presents

23 a low risk in that regard, but that's not to say  that

24 past behaviors, particularly voyeurism and inappropriate

25 touching and his viewing of pornography for several  hours

1   a day as a teenager and the escalating conduct  that

2   brings him before me does not raise a continued  concern.

3        Taking into consideration the nature of the  offense,

4   as well as the defendant's personal history  and

5   characteristics, I am persuaded that a custodial  sentence

6   of 36 months is reasonable and no greater than  necessary

7   to hold the defendant accountable, protect the  community,

8   provide the defendant the opportunity for  rehabilitative

9   programs, and achieve parity with the sentences of

10  similarly situated offenders.

11       As to Count 1 of the Information, it  is adjudged

12  that the defendant is committed to the custody  of the

13  Bureau of Prisons for a term of  36 months.  I recommend

14  that the defendant receive mental health  treatment,

15  educational/vocational training, and most  importantly sex

16  offender treatment and that the Bureau make a  priority

17  his placement in an appropriate facility, both  for that

18  purpose and in recognition of his  own vulnerabilities.

19       I also recommend that he be  afforded pre-release

20  placement in a residential reentry center with  work

21  release privileges.  This term of supervised  release must

22  follow -- supervised release must be at least  five years

23  under statute based on the nature of the offense  here.

24  And the defendant's pattern of sexual behaviors  began at

25  an early age, the term of imprisonment is to be  followed

1  by a 15-year supervised -- 15-year term of  supervised

2  release.

3      In light of the nature of the offense and  the

4  defendant's personal history, I adopt the conditions  1

5  through 4, 7 through 9, 11 through 23, noting  that

6  neither party raised objections to those  proposals.

7  Given the history, I have no difficulty finding  them

8  consistent with the Sentencing Reform Act of  1984.

9  Specifically the imposed conditions are warranted based

10  on all of the justifications set forth in  the presentence

11  report, his offense of conviction, and his  permanent

12  history requiring registration as a sex  offender, and

13  abiding by travel and employment restrictions  to other

14  states will be crucial to his monitoring, as  will the

15  other rules requiring his supervision,  compliance with

16  law, and notifying third parties of any risk  that his

17  personal history may pose.  He also has  a documented

18  history of mental health and cognitive issues  and will

19  likely benefit from  treatment.

20      Finally, as has been noted by the  probation office

21  as well as by the defense, there is a possibility  that a

22  supervising officer can find resources for  the defendant

23  that he has not been able to do on his own or  through his

24  family that may well benefit him in the longer  term.

25      I am inclined to add a third condition because  I

1  want to be sure that at some point there is a  proper
2  pre-release placement or a proper  placement here.  So if
3  the Bureau of Prisons is unable to place the defendant  in
4  a pre-release placement, I do recommend as  Special
5  Condition No. 24 that the defendant spend -- and I  adopt
6  the first -- and order that he spend the first 180  days
7  in a residential re-entry center as approved by  the
8  supervising U.S. probation officer.  His absences from
9  the center for employment purposes, mental  health
10  counseling and treatment, and for other passes consistent
11  with program rules should  be allowed.  He is to  pay his
12  own medical expenses, if any, and is to pay 25  percent of
13  his gross income toward the daily cost of  residence and
14  may be discharged early from the facility  upon approval
15  of both the facility administrator, supervising  U.S.
16  probation officer.  I believe under the  requirements I
17  will simply enter that as an additional  condition.
18      I want to ensure that the defendant has  a transition
19  into the community that is more structured than  would be
20  otherwise, but I will consult with the  probation office
21  as to whether that condition should be stated or if  I
22  should leave it to the Bureau of Prisons in  the first
23  instance.
24      With that, I note that there is some question  as to
25  whether I should go through each individual  condition

1    expressly as well as provide specific justification  for

2    those conditions and I would defer to the defense as   to

3    whether you want to waive that reading and  individual

4    justification or if you want me to go through   them

5    individually.

6         MR. BUGNI:  Your Honor, we will waive  that.

7    I've gone over that with Mr. Shilts and his  mom.

8         THE COURT:  Thank you.  If, when the  defendant

9    is released back into the community, either the defendant

10   or his family or the supervising probation  officer

11   believe that any of the conditions no  longer are

12   appropriate, I am certainly willing to  consider a

13   revision and any may -- well, the defendant or  the

14   probation officer may petition this court for  a revision,

15   and if they do so jointly, it is likely I will  grant it.

16   Regardless, I will consider  it.

17        The instant offense is not drug related  and the

18   defendant has no history of drug use, which is  to his

19   credit.  Therefore, the requirement for drug  testing

20   under Sec. 3583(d) of Title 18 is waived.  The defendant

21   is adjudged to pay a $100 criminal assessment penalty to

22   the Clerk of Court for the Western District of Wisconsin

23   immediately following sentencing.  And as for  other

24   mandatory restitution, he is to pay in the amount   of $500

25   to the Clerk of Court for the Western District  of

1    Wisconsin pursuant to Sec. 3664(d)(5) of  Title 18.  The

2    disbursements will go to Deborah A. Bianco,  who

3    represents a Pia, Ava and/or Mya in Bellevue,  Washington,

4    at the address indicated in the  presentence report.  The

5    defendant does not have the economic resources to  allow

6    himself to make full payment of restitution -- actually  I

7    think the address might be in the specific submission  by

8    the victim.  So regardless, the full address is  adopted.

9    I do find he lacks the economic means to pay any --  10

     well, to pay full restitution in the  foreseeable future

11   and therefore under Sec. 3664(f)(3)(B) of Title 18  he is

12   to begin making nominal payments of a minimum of  $50 each

13   month beginning within 30 days of his release  from

14   imprisonment.  The defendant shall notify the  Court and

15   the United States Attorney General of any  material change

16   in his economic circumstances that might affect  his

17   ability to pay restitution.  He does not have  the ability

18   to pay any further fine under Sec. 5E1.2(c)  without

19   impairing his ability to support himself upon  release and

20   so I impose no additional  fine.

21        The offense of conviction requires that  the

22   defendant pay a $5,000 assessment under the Justice for

23   Victims of Trafficking Act 2015 unless he  is indigent.

24   The defendant has been appointed counsel and  does not

25   have the financial resources to pay his assessment  and

1  therefore I make that finding and deem the  assessment

2  waived.

3       Final order of forfeiture is granted for  the

4  property seized from the defendant as reflected in  the

5  Court's earlier forfeiture order  by statute.   Finally,

6  the U.S. Probation Office is to notify local  law

7  enforcement agencies and the State Attorney General  of

8  the defendant's release to the  community.

9       I believe there are no counts  to dismiss.   So

10  Mr. Shilts, my final obligation is to advise you that you

11  have a right to appeal  my sentence.   You have  very

12  capable counsel who will assist you in filing a  notice if

13  you and he decide that  that's appropriate.   But you only

14  have 14 days to do so, so you should discuss that  with

15  him sooner rather than later and I am confident  he will

16  talk that over with you as  well.

17       Anything more for the government at this  time?

18  MS. ALTMAN:              Yes, Your Honor.   He did plead to

19  an Information, so I believe I do need to move  to dismiss

20  the first underlying  Indictment.

21       THE COURT:   All right.   To the  extent required,

22  then I dismiss the underlying  Indictment.

23       Anything more for the  defense?

24       MR. BUGNI:   Nothing, Your Honor.

25       THE COURT:   All right.   Mr. Shilts, you're going

1  to spend an additional time in a  federal prison.  I will

2  make what efforts I can to see that that is a  placement

3  where you can be part of a program that will  further

4  evaluate and try to assist you in understanding  this

5  compulsion that you have to look at these pictures  and

6  ways to stop it -- for you to stop it, which is  what

7  ultimately has to happen.  You will spend time in  a

8  residential re-entry center, either through the Bureau  of

9  Prisons or by direction of the probation office,  and

10  hopefully during that period you can find structure that

11  makes sense for you and puts you in the best position to

12  succeed going forward in your  life.

13      You have a lot of  wonderful qualities.  Apparently

14  your last employer would welcome  you back.  I hope you

15  find a path that gives meaning to the rest of  your life

16  and you can find a way to move away from  watching images

17  that are only ensuring that more small children  are

18  abused and that you no longer become a source  of demand

19  for that.

20      With that, we are  adjourned.

21      (Proceedings concluded at 4:18  p.m.)

22

23

24

25

1                    I, LYNETTE SWENSON, Certified Realtime  and

2    Merit Reporter in and for the State of Wisconsin,  certify

3    that the foregoing is a true and accurate record of  the

4    proceedings held on the 27th day of April 2017 before  the

5    Honorable William M. Conley, District Judge for  the

6    Western District of Wisconsin, in my presence and  reduced

7    to writing in accordance with my stenographic notes  made

8    at said time and  place.

9    Dated this 16th day of May  2017.

10

11                         /s/_____

12                         Lynette Swenson, RMR, CRR, CRC
                             Federal Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25